# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TIMOTHY BANKS,

      Plaintiff,

        v.

CBOCS WEST, INC., d/b/a/ Cracker Barrel
Old Country Store,

      Defendant and Counterplaintiff.

No. 01 C 795
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff Timothy Banks ("Banks") has filed suit against his former employer CBOCS West, Inc. ("CBOCS"), which operates the Cracker Barrel chain of restaurants and stores. Banks alleges that the company discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, when it demoted him from general manager to associate manager, and when it subsequently failed to promote him, gave him a final warning, terminated his employment and filed a counterclaim against him. After four years of litigation, CBOCS has moved for summary judgment of each of Banks' claims.

### I. Factual Background

Banks began working at Cracker Barrel in 1989 as a line cook. By 1999, Banks had been promoted several times, achieving the position of General Manager, and was in charge of an entire Cracker Barrel store (the "Tinley Park store"). Throughout his employment, Banks suffered from Crohn's disease, which affects his ability to properly digest food. Banks suffers daily from the symptoms of his disease, which include pain and diarrhea that necessitated up to a dozen trips to the restroom each day. His discomfort varies at times, but becomes worse during

what Banks describes as "flare-ups."  These flare-ups may last one day or may linger for up to one year.  During these flare-ups, Banks is unable to attend work or perform any work.  When he is not experiencing flare-ups, Banks still suffers from pain, discomfort and diarrhea but is capable of working.

In early 2000, Banks' symptoms began to worsen.  On March 14, 2000, Banks was suffering from so much pain, diarrhea and weight loss that he could no longer work.  Banks contacted his direct supervisor, District Manager John Morst ("Morst") and left a voicemail explaining that he needed time off for medical reasons.  Morst returned his call the following morning and insisted that Banks meet with him at the store and bring a doctor's note explaining his condition.  Later that afternoon Banks and his fiancée met with Morst.  After Banks stated that his medical condition was preventing him from working and that he needed time off from work, Morst informed Banks that the company could not hold the General Manager position open for him and that Banks would be replaced.  Morst indicated that upon Banks' return from leave, he would be placed in another store as an associate manager.  Banks accused Morst of demoting him because he was taking medical leave, but nonetheless completed an FMLA form requesting time off for his medical condition and began a period of medical leave.

By May 2000, Banks' condition had improved and he contacted Morst asking to return to work. to the point where he was able to return to work.  When Morst asked Banks to identify several stores at which he would prefer to work, Banks suggested the Hammond, Merrillville or Matteson stores because of their good location.  The next day, Morst offered Banks the position of Associate Manager at a store in Ottawa, Illinois (the "Ottawa store").  Banks initially refused the position because it would involve a 170-mile round trip from his home.

Banks contacted Regional Vice President Dave Swartling ("Swartling") to express his displeasure about the Ottawa location, as well as his change in status from General Manager to Associate Manager. Swartling promised Banks that the Ottawa position was temporary, and that the company would compensate him for his travel and temporary lodging expenses. Swartling also expressed surprise at learning that Banks believed his change in status was a demotion that violated the FMLA. Swartling believed that Banks had voluntarily stepped down and suggested that Banks was lying about being demoted in response to requesting medical leave. After the conversation, Banks relented and accepted the Ottawa store's Associate Manager position, believing that he had no choice but to do so.

Ultimately, Banks worked in Ottawa for less than two weeks. CBOCS then transferred Banks to the company's store in Matteson, Illinois (the "Matteson store"). Although he was much closer to home, Banks' fortune did not improve at this store, where he sensed that his regional manager, District Manager Bryan Frank ("Frank"), disliked him because of his complaint of discrimination. However, not everyone was unhappy with Banks. He received a quarterly performance evaluation from an immediate supervisor, Bill DeLarme, in which he was rated as "exceeds requirements."

CBOCS and Banks were unable to resolve their disagreement over the nature of, and reasons for, Banks' demotion to associate manager. On July 20, 2000, Swartling, Morst and Frank traveled to the Matteson store to meet with Banks and discuss his allegation that the demotion violated the FMLA and was an act of discrimination. Banks refused to discuss the issue because he had already retained counsel to represent him in litigation he intended to file

related to the demotion. Banks filed a charge of discrimination with the EEOC on October 17, 2000, and filed the first Complaint in this action on February 5, 2001.

After filing his Complaint, Banks continued to work at the Matteson store as an associate manager, receiving evaluations with an overall score of "3/meets requirements" (on a scale of 1 to 5) for the first, second and third quarters of Fiscal Year ("FY") 2001. Defendant then transferred Banks to its Merrillville, Indiana store where General Manager Hans Oskam became Banks' immediate supervisor. Frank remained Banks' regional District Manager.

Sometime during July 2001, Banks asked Oskam and Frank what he would need to do to be promoted to Senior Associate Manager ("SAM"), a position that falls between associate and general managers. Banks also reviewed the Field Management Demotion Policy (FMDP) posted on the company intranet, which discussed requirements for former general managers seeking promotion to the SAM position. Banks formally sought promotion to the SAM position via letter to Regional Vice President Swartling in August, 2001.

Banks did not receive a response to his request for promotion for eight months. During that time, he began receiving negative evaluations and feedback from his manager. For example, Banks received a score of "2/needs improvement" on his fourth quarter and overall annual evaluation for FY 2001. That evaluation period ended in July 2001, before Banks made his written request for promotion but after Banks indicated his interest in promotion to Oskam and Frank. Banks contends that he was fully qualified for promotion when he applied in August 2001 because his most recent evaluations placed him in the "meets requirements" or "exceeds requirements" categories and because he did not receive the fourth quarter evaluation until September 2001. However, the July 2001 evaluation would not be Banks' only low score. He

received a second "2/needs improvement" rating in his evaluation for the first quarter of FY 2002.[1]  Banks was also "written up" in January, 2002 for failing to complete some of his managerial responsibilities.

Banks claims that in the period after he requested a promotion, Oskam treated him more harshly than other associate managers, and in particular Bob Cherepski, whom Banks alleges violated multiple CBOCS policies but who was nonetheless promoted to General Manager. Banks alleges that Oskam manufactured reasons to lower Banks' quarterly performance scores, in order to prevent his promotion, and "wrote him up" for policy violations that were either non-violations or violations routinely tolerated when committed by others.  Finally, in April 2002, Defendant denied Banks' request for promotion to SAM in a letter signed by Swartling explaining that Banks failed to meet all of the requirements for the position.

Two months later, CBOCS issued Banks a final warning for violating its asset protection policy when he allowed his (future) wife to be present in a restricted area of the store after it was closed.  Several weeks after receiving that final warning, Banks left a message in Oskam's voicemail criticizing Oskam's treatment of Banks in front of another employee.  That voicemail stated:

> This message is for Hans. I just want to let you know, don't you ever humiliate me again by making me stand there and enter an order into the computer while you sit on your butt in the chair and talk to your sidekick Bob.  I will not tolerate it.

---

[1]Banks observes that on this evaluation, he received a score of "2" on the criterion of "achieving retail sales."  It is the CBOCS' policy to give every manager in a store the same score for that category, which is based strictly on sales data.  However, Assistant Manager Bob Cherepski received a score of "5" for the same category on the same quarterly evaluation.  If Banks had received the same "5" rating, as the policy required, it is likely that he would have received an overall rating of "3/meets requirements," a score necessary for promotion to the SAM position.

Oskam forwarded the message to District Manager Frank, who informed Swartling that he intended to fire Banks. Swartling did not disapprove of Frank's decision and Banks was fired on July 17, 2002.

Banks claims that his termination was inconsistent with CBOCS' behavior toward other associate managers charged with similar bad behavior, and that his termination was actually an act of retaliation for his decision to file a discrimination complaint based on his demotion from General Manager to Associate Manager. Banks also claims that CBOCS' decision to file a counterclaim against him in this case was an additional act of retaliation. The remainder of this opinion addresses each of Banks' FMLA- and ADA-based claims, beginning with his demotion to Associate Manager and concluding with the events that led to his termination and CBOCS' decision to file a counterclaim against him.

## II. Summary Judgment of Banks' Claims

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986). A genuine issue of material fact exists when there is evidence on the basis of which a reasonable jury could find in the plaintiff's favor, allowing for all reasonable inferences drawn in a light most favorable to the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Banks must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Defendant demands summary

judgment of Banks' claims on three grounds: 1) Banks' ADA claims fail because he is not disabled as a matter of law; 2) Banks' FMLA claim of retaliatory demotion fails because he was a "key employee," and therefore not entitled to reinstatement; and 3) Banks' remaining claims fail because he failed to raise genuine issues of material fact demonstrating that he was subject to unlawful retaliation under either the FMLA or ADA.

### 1. Banks' Disability

The ADA prohibits employers from discriminating against persons with disabilities in connection with employment activities including advancement and discharge. 42 U.S.C. § 12112. The ADA protects "qualified individual[s] with a disability," defined as "individual[s] with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Id*. § 12111(8). An employee must be disabled within the meaning of the statute in order to qualify for its protection. Defendant insists that Banks is not entitled to protection under the ADA because he is not disabled as a matter of law.

A disability is a "physical or mental impairment that substantially limits one or more of the major life activities of such individual[s]." *Id*. § 12102(2)(A). Additionally, a disability may constitute a "record of such impairment" or "being regarded as having such impairment." *Id*. § 12102(2)(B)-(C). A physical impairment is "any physiological disorder or condition . . . affecting one or more" of certain of the body's systems, including the digestive system. 45 C.F.R. § 84.3(j)(2)(i). Whether a plaintiff is disabled under 42 U.S.C. §12102 turns on whether the plaintiff suffered from a physical or mental impairment; whether the major life activity claimed by the plaintiff constituted a major life activity under the ADA; and whether the

plaintiff's impairment substantially limited the major life activity. *Furnish v. SVI Sys.*, 270 F.3d 445 (7th Cir. 2001) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631-39 (1998)).

Defendant contends that Banks is not disabled because he cannot establish that he was substantially limited in performing a major life activity or demonstrate that he was substantially limited in his ability to perform a wide range of jobs, and that his impairment was too "intermittent" to constitute a disability. Defendant also argues that Banks falls outside of the ADA's protection because he is not a "qualified employee" in light of his inability to perform his job during flare-ups. Banks argues that he was substantially limited in performing the major life activities of digesting food and proper waste processing; that although he was not substantially limited in his ability to perform a wide range of jobs, his employer perceived him as being so limited; and that Defendant's argument that Banks is not "qualified" is inconsistent with its argument that he was not substantially limited.

### A. Substantial limitation of major life activity

"[N]ot all plaintiffs with health conditions have a 'disability' within the meaning of the ADA." *Nawrot v. CPC Int'l*, 277 F.3d 896, 903 (7th Cir. 2002). In order for an impairment to "substantially limit" a major life activity, it must "considerabl[y]" or "to a large degree" interfere with that activity. *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 196-97 (2002). Impairments "that interfere in only a minor way" with the activity do not fall within the ADA's protection. *Id*. at 197. In short, "to be substantially limited in performing . . . tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id*. at 198. Defendant does not dispute that Banks suffers from Crohn's disease, an illness that causes inflammation of the

intestines, but contends that Crohn's disease does not severely restrict Banks from engaging in any major life activities. Banks adamantly disagrees, claiming that his disease substantially limits the major life activities of digesting food and proper waste processing.

At first blush, this Circuit's precedent suggests that food digestion and waste processing are not major life activities. *See Furnish*, 270 F.3d 445. In *Furnish*, the plaintiff suffered from cirrhosis of the liver. *Id*. at 449. The plaintiff alleged that his impairment affected the major life activity of "liver function" and specifically, that reduced liver functioning affected the ability of his body to "eliminate toxins and maintain appropriate glucose levels." *Id*. The Seventh Circuit held that "'liver function' bears little resemblance to the major life activities enunciated in the ADA regulations" and that reduced liver functioning was a "characteristic of the impairment" rather than a major life activity. *Id*. The Court further noted that even if liver function was considered a major life activity, the plaintiff could not prove that his disease substantially limited the functioning of his liver as the record demonstrated that his liver function was "right on the borderline . . . but . . . was adequate" if not "absolutely normal." *Id*. at 450-51. In this case, Defendant argues that if difficulties with liver function are considered a characteristic of the impairment of Hepatitis B, then difficulties with food digestion and waste processing must be considered a characteristic of the impairment of Crohn's disease. In other words, such rote bodily functions like digesting food and processing waste are not "activities" within the meaning of the ADA.

Defendant places too great a weight on the term "waste processing," instead of recognizing Banks' condition for what it is: an inability to control his bowels. Banks' claimed disability is not limited to processes like toxin elimination and glucose level maintenance.

Rather, his disability is an inability to eliminate waste properly from his body.  A recent opinion of the Court of Appeals for the Third Circuit supports this distinction.  *See Fiscus v. Wal-Mart Stores*, *Inc.*, 385 F.3d 378, 382-84 (3d Cir. 2004) (involving a plaintiff who suffered from kidney disease).  In *Fiscus*, the Third Circuit overturned the district court's conclusion that the plaintiff alleged merely "kidney function" as the substantially limited major life activity, holding instead that the plaintiff alleged a substantial limitation on the major life activity of cleansing blood and processing waste.

The Court further held that cleansing and eliminating waste from blood is not simply a characteristic of kidney failure but the effect of kidney failure felt on an "internal autonomous organic activity" in a manner "not incompatible with a finding of substantial limitation of a major life activity."  *Id*. at 384; *see also Workman v. Frito-Lay Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) (holding that waste elimination can be a major life activity).  In holding that blood cleansing and waste processing constitute major life activities, the Court took note of this Circuit's decision in *Furnish*, observing that *Furnish* "was adjudicated . . . on the express theory that the major life activity was nothing more or less than 'liver function' [and that] [t]he plaintiff did not assert that the impaired liver function actually affected waste removal or blood cleansing."  *Fiscus*, 385 at 385.

Banks' allegations, like those of the plaintiff in *Fiscus*, are substantively different from those made by the plaintiff in *Furnish*.  Banks does not allege a major life activity of "intestinal function."  *Cf. Furnish*, 270 F.3d at 449.  Rather, he explicitly alleges an inability to digest food and properly eliminate waste in a manner that causes him to experience pain and diarrhea on a daily basis.  Waste processing, unlike "liver function," is a natural counterpart to some of the major life activities identified by the Equal Employment Opportunity Commission Regulations

interpreting the ADA. *See id.*; *and* 29 C.F.R. § 1630.2(i) ("[m]ajor life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working). Moreover, it seems a matter of common sense that if eating constitutes a major life activity, *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001), waste processing also qualifies as a major life activity.

I find that Banks' impairment imposes a limitation on the major life activity of waste processing. I also find that Banks has sufficiently alleged a *substantial* limitation on the major life activity of proper waste processing: he requires excessive trips to the restroom for chronic and painful diarrhea.[2] As Banks has successfully claimed a disability pursuant to § 12102(2)(A), I need not address Banks' allegation that he is also disabled under § 12102(2)(C).[3]

### B. Alleged "intermittent" nature of Banks' disability

Defendant also claims that Banks' disability is so intermittent that it cannot constitute a disability under the ADA. That argument is premised on Defendant's assumption that the major life activity limited by Banks' impairment is working. *See, e.g.*, *Moore v. J.B. Hunt Transp.,*

---

[2]Defendant attempts to manipulate the concept of "limitation" in order to argue that Banks' manifestation of Crohn's disease is not a limitation of the major life activity of waste processing. In essence, Defendant argues that Banks' daily diarrhea and frequent trips to the restroom do not *limit* his digestion and waste processing; to the contrary, Banks' symptoms increase and exacerbate these activities. Under Defendant's logic, a Crohn's patient who suffers from diarrhea would not be protected by the statute, but a Crohn's patient who suffers from constipation would be. This argument has no merit. Banks' symptoms constitute a substantial limitation on the major life activity of proper waste processing.

[3]Banks contends that he is disabled under the ADA because the Defendant mistakenly believed that he had an actual impairment substantially limiting a major life activity. *See* 42 U.S.C. § 12102(2)(C); *and Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001). On this point, Banks offers only speculation and faulty reasoning to support his argument that Morst's refusal to allow Banks to return to the position of general manager necessarily entailed a decision that Banks was "substantially limited in the broad class of jobs of being a general manager of a restaurant or store."

*Inc.*, 221 F.3d 944, 951-52 (7th Cir. 2001) (impairment that is only intermittent in nature is not

disability).   However, I have already found that the major life activity substantially limited by

Banks' impairment is proper waste processing, not work.   *Cf. id.* at 952 (only major life activity

affected by plaintiff's impairment was working and his arthritis "flare-ups" affected his ability to

work on only an intermittent basis).

In *Moore*, the plaintiff attempted to use his flare-ups to establish that his impairment was

a disability.   *Id*. at 952.   Both parties agree that Banks' symptoms are at their worst during severe

flare ups, which Banks admits are temporary in duration and sporadic in nature.   However,

Banks suffers from pain and diarrhea on a daily basis, necessitating up to a dozen trips to the

restroom on any given day.   These symptoms establish that his Crohn's disease is a disability

whether or not he is experiencing a flare-up.[4]   *Cf. Ogborn v. United Food and Commercial*

*Workers Union, Local No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) (plaintiff's "isolated bouts" of

depression not disability; plaintiff claimed depression substantially limited only the major life

activity of working, and failed to identify evidence that depression limited his ability to work for

more than short period of time).   Banks' disability is not so intermittent as to fail to constitute a

disability within the meaning of the ADA.

### C.  Banks' Status as Qualified Employee

---

[4]This is not to say that any diagnosis of Crohn's disease constitutes a disability under the ADA.  Many individuals who suffer from the disease do not experience the same symptoms, or the same degree of symptoms, as Banks.  *See* Mayoclinic.com, *Inflammatory Bowel Disease: Signs and Symptoms*, *at* http://www.mayoclinic.com/invoke.cfm?objectid=908E0EEE-98DF-4A18-8E426B22F7133F21 &dsection=2 (last visited Apr. 26, 2005) (observing that symptoms  range from "mild to severe"). While Banks' symptoms are consistent with a finding that he is disabled, this ruling should not construed to suggest that Crohn's disease is, *per se*, a disability.

Finally, Defendant claims that Banks cannot be a qualified, disabled employee within the meaning of the statute because he is unable to work during the times he suffers from "flare ups." A person is a "qualified individual with a disability" if he or she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment condition that such individual holds." 42 U.S.C. § 12111(8). As just noted, Banks' flare-ups are intermittent in nature, often occurring years apart. Moreover, there is a legitimate factual dispute as to whether or not Banks could perform the essential functions of his job during flare-ups. Banks contends that he was fully capable of performing the functions of his position as general manager with the reasonable accommodation of taking leave during his "flare ups." Defendant contends that the central job duties of both the general and associate manager positions include, *inter alia*, attendance and presence at the locations managed.

Attendance and presence is typically a primary responsibility of any employee. *See, e.g., Waggoner v. Olin Corp.*, 169 F.3d 481 (7th Cir. 1999). However, the Seventh Circuit has upheld a jury verdict finding that a failure to accommodate a reasonable request for medical leave violates the ADA. *Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591(7th Cir. 1998). Noting that the absence of employees is inherently disruptive to an employer, the Court observed that "it is not the absence itself but rather the excessive frequency of an employee's absences in relation to that employee's job responsibilities that may lead to a finding that an employee is unable to perform the duties of his job." *Id*. at 602.

It is possible that Banks' two-month absence in early 2000 rendered him unqualified under the ADA. However, on the record before me I am unwilling to make this finding as a matter of law, particularly when Banks did return to work and remained Defendant's employee for another two years. *Cf. Waggoner*, 169 F.3d at 484-85 ("in most instances the ADA does not

protect persons who have erratic, unexplained absences, even when those absences are a result of a disability"; plaintiff had not made "genuine request for a reasonable accommodation"). Defendant is not entitled to summary judgment on this ground. *See Haschmann*, at 151 F.3d at 602 ("[c]onsideration of the degree of excessiveness [of an employee's absence] is a factual issue well suited to a jury determination").[5]

In sum, I find that Banks is disabled under the ADA because his Crohn's disease substantially limits the major life activity of proper waste processing in a manner that is not intermittent, and that whether Banks was a "qualified" employee under the ADA is an issue of fact that withstands summary judgment.

### 2. Banks' FMLA-based Claim of Retaliatory Demotion

Banks claims that in March 2000, Defendant violated the FMLA's anti-retaliation provisions by demoting him from general manager to associate manager in response to his request for medical leave. Defendant contends that it did not demote Banks, but that it deemed him a "key employee" and did not intend to return him to his general manager position at the conclusion of his leave. The FMLA allows employers to deny restoration to certain highly compensated employees when denial is "necessary to prevent substantial and grievous economic injury" to the employer. 29 U.S.C. § 2614(b)(1); 29 C.F.R. § 825.219. Employees subject to this limitation are those among the top 10 percent of the highest paid employees within 75 miles of the facility at which the employee is employed. *Id.* For this key employee exception to apply, the employer must notify the employee of its intent to deny restoration at the time the employer determines that a substantial and grievous injury would occur. *Id.*

---

[5]*But see Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998) (plaintiff with Crohn's disease was not qualified individual because he could not satisfy the essential job function of attending work).

Facts offered by both parties establish that Banks was a key employee for purposes of 29 U.S.C. § 2614(b)(1). In March 2000, Banks was a general manager of Defendant's Tinley Park store. District Manager Morst was Banks' direct supervisor. On March 14, Banks left Morst a voicemail message indicating that he would not be at work because he needed time off as his Crohn's disease was flaring up. Banks then met Morst at the Tinley Park store, where he again explained that he needed to take an unspecified period of time off due to his Crohn's disease. Morst stated that he "couldn't hold" Plaintiff's position for him. Banks' then-fiancée, who was present for part of the meeting, remembers that Morst said either "I have no choice but I can't hold your position for you," or "I have no choice but to replace your position." Banks alleges that Morst informed him that upon his return from leave, he would be placed in another store as an associate manager, a position two steps below Banks' position as general manager. Morst then gave Banks an FMLA form, which Banks subsequently signed. The form stated, in part:

> You are a "key" employee if you are a salaried eligible employee and are among the highest paid 10% of employees within .75 miles of the work site.[6] If you are a key employee, restoration to employment may be denied following FMLA leave on the grounds that such restoration will cause Cracker Barrel substantial and grievous economic harm.

At his deposition, Banks testified that he was familiar with the form and that he did not have any questions about the form when he signed it.

At issue is whether Defendant fulfilled its obligation to notify Banks that it intended to deny his restoration to general manager because he was a key employee. Banks was the highest-level manager and authority at Defendant's Tinley Park store and admits believing that he was

---

[6]Defendant's form mistakenly states that a key employee is "among the highest paid 10% of employees within .75 miles of the work site." Banks presumes, as do I, that this is a drafting error. The statute specifies a distance of 75 miles. 29 U.S.C. § 2614(b).

among the highest paid ten percent of employees at that store in March 2000.  In fact, all of

Defendant's general managers, senior associate managers, associate managers and retail

managers are among the highest paid ten percent of employees within seventy-five miles of a

given store.  Defendant contends that all of these individuals are informed during training that

they are key employees for purposes of the FMLA.  Banks contends that he received no such

training; nonetheless, he received and reviewed the form explaining the key employee

classification and knew that he was among the highest paid individuals at his store.

Banks contends that Defendant cannot rely on the so-called key employee exception

because it failed to notify him in writing that he would be subject to the provision.  Banks also

challenges Defendant's reliance on the provision because Defendant failed to offer any evidence

that it made a specific finding that it would suffer "substantial and grievous harm" if forced to

restore Banks to his position, and because it would not have suffered substantial or grievous

harm had Banks returned to his general manager position.  *See* 29 C.F.R. 825.219 ("as soon as an

employer makes a good faith determination, based on the facts available, that substantial and

grievous economic injury to its operations will result . . . the employer shall notify the employee

in writing of its determination").  *See also Thomas v. Perle Vision, Inc.*, 251 F.3d 1132, 1134,

n.1 (7th Cir. 2001) (noting that regulations implementing the FMLA require an employer "to

provide the employee written notice at the time the employee requests leave that it intends to

deny restoration pursuant to § 2614"and that "[i]f the employer does not provide written notice

to the employee, then it loses its right to deny restoration").

However, *Thomas v. Perle* explicitly cautioned against too rigid an application of § 2614

and its implementing regulations.  *Id*. at 1140.  Despite overturning the district court's decision

granting summary judgment in favor of the defendant employer, the Seventh Circuit specifically

minimized the distinction between formal written notice and other forms of definitive notice. *Id.* ("[l]est we elevate form over substance, we discuss briefly whether [Plaintiff] was actually damaged by [Defendant's] failure to provide her written notice that she was a highly compensated employee and that it intended to deny job restoration"). In that case, the plaintiff had received conflicting messages about the possibility of returning to her position. The Court concluded that "[Defendant's] actions should not be considered so clear to a reasonable individual . . . that it considered [Plaintiff] to be a highly compensated employee and would not necessarily offer [Plaintiff] job restoration when she returned from leave." *Id.*

In this case, Morst's statement that he "couldn't hold" Banks' position, at a meeting during which the two discussed Banks' leave for medical reasons and during which Morst handed Banks the Defendant's Leave of Absence form, gave Banks the clear notice intended by the statute. *Cf. id.* (finding that defendant employer failed to provide plaintiff with "a clear and definite statement of its intentions"). Furthermore, I do not believe that Banks is entitled to claim that Defendant did not, or could not, have made a determination that his absence would cause serious or grievous harm. Nothing in the statute indicates a required process or procedure for determining that an employee's absence would cause serious or grievous harm. According to Banks' own allegations, the store at which he was a general manager "had a troubled history with staffing and management that lacked experience, making it a 'tough' store." *Pl. Resp.* at 1. Because I find that Banks was on notice that he was a key employee not entitled to return to the same position after taking medical leave, Defendant's demand for summary judgment of Banks' claim of retaliatory demotion is granted.

### 3. Banks' Claim of Unlawful Retaliation

Because Banks was a "key employee" when he sought medical leave under the FMLA due to his disability, Banks' claims are limited to Defendant's actions after his return to work as an Associate Manager. These include retaliation in violation of the FMLA and ADA for Defendant's failure to promote him, its final warning and decision to fire him, and Defendant's filing of counterclaims against him in this lawsuit. The same legal analysis governs Title VII, ADA and FMLA retaliation claims. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). To withstand summary judgment, Banks may present direct evidence of retaliation, or alternatively, may present indirect evidence of retaliation under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Banks first contends that he has presented direct evidence of retaliation. Banks may establish retaliation under the direct method of proof by producing circumstantial evidence that would allow a fact-finder to infer retaliation, for example, through suspicious timing or ambiguous statements or through evidence that similarly situated employees were treated differently. *Volovsek v. Wisc. Dep't of Agric., Trade, & Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). However, circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Alternatively, Banks claims that he has presented sufficient evidence to establish a *prima facie* case of retaliation under the *McDonnell Douglas* test and to demonstrate that Defendant's reasons for each of its allegedly retaliatory decisions are pretextual.

A. *Defendant's Failure to Promote Banks to Senior Associate Manager*

Banks contends that there is both direct and indirect evidence that Defendant's failure to promote him to the position of Senior Associate Manager ("SAM") was an act of retaliation in

violation of the FMLA and ADA. Banks claims that his October 2000 EEOC charge and February 2001 federal suit gave Defendant ample reason to retaliate against him. Banks first asked General Manager Hans Oskam, about the requirements for promotion to SAM in July 2001, and applied for the promotion to SAM on August 6, 2001. Defendant did not respond to Banks' request until eight months later, on April 26, 2002, when Regional Vice President David Swartling informed Banks that he was not qualified for promotion. Swartling's letter noted Banks' deficient performance evaluations and written performance counseling between August 2001 and April 2002.

Defendant now claims that its decision that Banks was unqualified for promotion was *also* based on Banks' "general skills and performance, including his manner with employees." Defendant appears to add these additional grounds for its decision because most if not all of the grounds cited in the letter arose after Banks' application for promotion. By offering other reasons for the denial, and contesting Banks' characterization of the requirements for promotion, Defendant claims that there are no genuine issues of fact to support his allegation that the denial was an act of retaliation for Banks' initial complaint of discrimination.

Banks contends that Defendant delayed its response to his request for a promotion until Defendant had sufficient time – eight months, in fact – to manufacture reasons to deny the promotion. Banks finds Defendant's reliance on his poor evaluations as the basis for his failed promotion particularly troubling. Banks argues that prior to his request for promotion he had received consistently positive evaluations, but that between his request for promotion and Defendant's eventual denial, his evaluations took a marked turn for the worse. In a July 31, 2001 evaluation, Defendant rated Plaintiff's overall performance as a "2/needs improvement" on a scale ranging from 1 to 5. Defendant emphasizes that this evaluation was completed prior to

Banks' request for promotion; however, it occurred on the last day of the same month during which Banks informally indicated his interest in promotion to his general and district manager.

Banks' subsequent performance evaluation, in November 2001, also received a "2/needs improvement" rating. On this evaluation, Banks received a score of "2" on the objective, store-wide criteria of achieving retail sales. Defendant admits that another assistant manager, Bob Cherepski, received a score of "5" for this same measure, and that Banks and Cherepski should have received the same score for this measure. Defendant also admits that if Banks had received the same score as Cherepski, he most likely would have received an overall quarterly rating of "meets requirements" rather than "needs improvement."

I agree that the timing of these negative performance evaluations is suspicious, given Banks' July 2001 interest in pursuing a promotion and Banks' inconsistent, low score on a purportedly objective criteria on his next evaluation. Suspicious timing notwithstanding, these evaluations are not direct (circumstantial) evidence of retaliation. The timing is suspicious in that it suggests Defendant may have been manufacturing reasons not to promote Banks. However Banks has not offered evidence suggesting that Defendant's motivation was retaliation for Banks' suit, except to point out that it occurred after his suit was filed and that he felt threatened when visited by Swartling, Morst and Frank to discuss his complaints about the demotion. These facts are not sufficient to establish a retaliatory animus, and do not create a genuine issue of material fact sufficient to withstand summary judgment. The other facts raised by Banks also fail as direct evidence of retaliation for the same reason.[7] Therefore, Banks must

---

[7]Swartling's letter informing Banks that he was unqualified for promotion also noted that Banks had received written counseling reports "concerning your failure to run shifts properly and follow company procedures." Banks claims that the counseling reports, received in the months between his promotion request and Defendant's denial of that request, were for "trivial" or "non-existent issues" for which other similarly situated employees were not disciplined

demonstrate retaliation through the indirect, burden-shifting method in order to withstand summary judgment of this particular claim.

To establish a *prima facie* case of retaliation under the ADA or FMLA, Banks must show that: 1) he engaged in statutorily protected activity; 2) he performed his job according to Defendant's legitimate expectations; 3) despite meeting those expectations he suffered a materially adverse employment action; and 4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). Banks must satisfy each element of the *prima facie* case. *Id*. Defendant claims that Banks' failed to meet its legitimate expectations for promotion to SAM and that Banks cannot point to evidence showing that similarly situated employees who did not engage in protected activity were treated more favorably than he.

Banks and Defendant disagree on the requirements for Banks to have legitimately met Defendant's expectations for promotion to SAM. Defendant claims that for promotion, Banks needed a "meets requirements" score on the July 2001 evaluation that immediately preceded his request for promotion. Defendant also asserts that Banks was required to complete an associate manager checklist and secure the approval of his general manager and district manager before seeking promotion. These requirements are listed in Defendant's Associate Manager Development Guide ("AMDG"). Banks argues that he was not subject to the AMDG

---

despite engaging in the same behavior. Banks does not contest that he engaged in the behavior for which he was cited in those counseling reports; rather, he believes that one was not truly an offense and that he was singled out for counseling as part of a campaign of harassment designed to retaliate against him for his request for and use of FMLA leave in March and April 2001. Banks, however, presents no evidence that the counseling reports were retaliation for his retaliatory demotion complaint, supporting his argument only by pointing to the timing of the reports and by making unsupported accusations about Defendant's "retaliatory animus" toward him. Absent any supporting evidence, Banks' accusations and allegations are not direct evidence of retaliation.

requirements, but was subject instead to the requirements of Defendant's "Field Management Demotion Policy" (FMDP) because he had formerly served as a general manager. The FMDP states that "[i]n order to transfer to a new store or move into the Senior Associate Manager position, the incumbent must not have experienced recent performance problems of any sort and must submit a written request to the Restaurant Regional Vice President who will need to approve the same." Whether Banks was required to fulfill all of the AMDG requirements or simply meet the requirements of the FMDP is an issue of fact that cannot be resolved on summary judgment. Furthermore, while Banks' poor evaluation in July 2001 would likely render him ineligible for promotion under both policies, a jury would also be entitled to consider the timing of that evaluation and whether it actually preceded Banks' request for promotion.

Defendant claims that its decision not to promote Banks was also based on a determination by District Manager Frank that Banks was not ready for promotion. Frank allegedly based his impression on Banks' "manner with employees who directly reported" to him and on Banks' failure to exhibit necessary leadership qualities. Those observations were not included in Defendant's letter to Banks denying promotion, but were first expressed during this litigation. The timing of Frank's observations are suspect if one believes that he harbored animus toward Banks in light of Banks' decision to file an EEOC charge against Defendant. Once again, Banks presents no evidence that Frank's animus, if it existed, was related to Banks' EEOC charge or federal suit. However, a jury could reasonably find that Defendant's new and undocumented justification for its failure to promote Banks demonstrates a retaliatory animus. I believe that Banks has raised a genuine issue of material fact regarding his qualifications for promotion at the time of his application, and Defendant's justification for its decision not to promote him.

To withstand summary judgment Banks must also demonstrate that similarly situated employees were treated more favorably than he was. *Hilt-Dyson*, 282 F.3d at 465. This is a difficult task, made no easier for Banks because of Defendant's multiple explanations for its decision not to promote Banks. Banks does his best to identify a similarly situated employee in Bob Cherepski, another associate manager who was promoted to SAM. Banks makes numerous allegations about Cherepski's spotty record, ranging from an incident in which another employee alleged that Cherepski inappropriately touched her to Cherepski's failure to follow all company policies. Many of Banks' allegations regarding Cherepski are unsupported by the record and cannot assist Banks in avoiding summary judgment. Even those allegations that are supported, however, do not establish that Cherepski was similarly situated to Banks at the time he was promoted.

Banks admits that he was disciplined (received counseling reports) for not following Defendant's best practices program and for failing to complete an entry on a food cost containment calendar. Defendant considered both of these instances to involve a failure to perform management functions, and both counseling reports were mentioned in Swartling's letter explaining why Banks was ineligible for promotion.[8] Defendant admits that Cherepski also received "two or three" counseling reports during his tenure as an associate manager. One of those reports involved an incident in which an employee complained that Cherepski inappropriately grabbed and/or pushed her; however, Frank testified that he could not substantiate the allegations. There is no evidence regarding reasons for the other reports, nor the timing of the reports in relation to Cherepski's promotion. This evidence is not sufficient to

---

[8]Banks claims the first counseling was for an issue that was not, technically, a policy violation and that the second counseling was for a violation that was routinely tolerated from other associate managers. However, Banks offers no evidence to support these assertions.

establish that Cherepski was similarly situated to Banks at the time Banks sought promotion. *See Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993) (for plaintiff to establish that he is "similarly situated" to another employee, he must prove that "equally bad employees were treated more leniently"); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349-50 n.3 (7th Cir. 1997) (rejecting plaintiff's Title VII claim for failure to demonstrate that the employees whom plaintiff alleged received more favorable treatment "engage[d] in all of the same misconduct" as plaintiff).[9]  Moreover, while Banks offers evidence that Oskam had some concerns about Cherepski's leadership skills (an alleged basis for Frank's decision not to promote Banks), there is no evidence that Franks, the relevant decision-maker, held that opinion of Cherepski.

Banks simply lacks enough facts to establish that Cherepski was a similarly situated employee.  Nor can Banks point to evidence that any other similarly situated employee who did not file a complaint of discrimination was treated more favorably than him.[10]  For these reasons,

---

[9]Oskam once observed Cherepski violate company policy when Cherepski signed a form indicating that he was completing management functions that in fact he was not doing.  Frank never learned of this incident because Oskam failed to issue a counseling report.  Banks believes that this incident, in combination with the others, demonstrates that Cherepski was similarly situated to Banks – an occasional violator of company policy.  I am not willing to stretch the facts this far.  Oskam managed multiple associate managers and was responsible for the operations of an entire store.  There is nothing in the record suggesting that Oskam consistently ignored policy violations by some managers but not by Banks so as to create a genuine issue of fact that Cherepski was similarly situated to Banks.

[10]Banks does not raise a genuine issue of material fact by asserting that "Defendant's discovery answers reveal that of the sixty-one AM's who applied for the SAM program from 2000 to 2002, only Banks was denied the position."  Defendant's discovery answers reveal only that 61 associate managers in Plaintiff's region entered the SAM program between 2000 and 2002.  Defendant's response does not address denials to the program and therefore does not create an issue of fact.

I find that Banks failed to establish a *prima facie* case of retaliation and grant Defendant's motion for summary judgment on this claim.

   *B. Defendant's Final Written Warning and Termination of Banks' Employment as Retaliation*

Two months after Banks was denied promotion to SAM, and during discovery for this suit, Defendant issued Banks a final warning for violating its asset protection policy when he allowed his wife into a back area of the store. Banks argues at length that his wife's presence at the store was not a violation of store policy.[11] Those arguments are irrelevant, however, as the final warning was not a materially adverse employment action and cannot form the basis of a retaliation claim. *Grube v. Lau Indus.*, 257 F.3d 723, 729-30 (7th Cir. 2001) (even "[u]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"). *See also Balderrama v. Kraft Foods N. Am., Inc.*, 307 F. Supp. 2d 1012, 1014 (N.D. Ill. Mar. 9, 2004) (holding that a written warning purportedly in retaliation for protected activity "does not amount to an adverse employment action") (citing *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901-02 (7th Cir. 2003)). Banks contends that Defendant based its subsequent decision to fire him in part on this final warning; but having presented no evidence to that effect, as discussed below, the final warning stands as nothing more than a warning that caused no materially adverse consequences

_____

   [11]Banks' fiancée was also Defendant's employee, but was employed at a different store than the one at which Banks worked. Defendant's asset protection policy, in place at the time Banks was alleged to have violated the policy, allowed "non-working employees" to be present in the back of the store if accompanied by management, but did not allow "visitors" to be present in that location. The parties dispute whether Banks' fiancée was a visitor to the store or a "non-working employee" when Banks permitted her to join him in the back of the store.

to Banks.[12]   Therefore Defendant's decision to issue Banks a final written warning was not an act of retaliation in violation of the FMLA or ADA.

Defendant fired Banks on June 17, 2002, after Banks left a voicemail message for Oskam that District Manager Bryan Frank considered an act of insubordination.  In his deposition, Frank, who made the decision to fire Banks, testified that he considered the message's substance and tone to be insubordinate and "completely disrespectful," and that he terminated Banks' employment based on the insubordinate message.  Frank further testified that Banks' recent "final warning" for violating the asset protection policy was not a basis for his decision to fire Banks, and that the final warning would only have served as a basis for firing Banks if Banks had again violated the asset protection policy.

Banks argues that the decision to end his employment must have been based on his prior warning because the report documenting his termination states that "[o]n 6/14/02 you were placed on final written notice for being in violation of Cracker Barrel's asset protection policy." This is an ineffective effort to raise an issue of fact regarding the reasons for Defendant's decision to terminate Banks' employment.  The same letter begins by summarizing the content of the voicemail message Banks left for Oskam.  The letter then states:

> This incident places you in direct violation of the Cracker Barrel rules of conduct. You are insubordinate on rules of conduct #1, #4, #14.  This is grounds for immediate termination.

After noting that Banks had received a final written warning for different conduct, the letter reiterates the reason for Banks' termination: "[y]our employment with Cracker Barrel will be terminated effective immediately for insubordination."

---

[12]Banks allegation that Oskam was a "snitch" for reporting Banks' conduct (bringing his wife to the back area of the store) does not convert the written warning into retaliation when he has no proof that Oskam's course of behavior was in any way in retaliation for Banks' lawsuit.

Banks' supposition that Franks actually fired Banks due in part to the earlier, final warning does not raise a genuine issue of material fact regarding the reason for Defendant's termination of his employment. Given Frank's deposition testimony and the letter sent to inform Banks of his termination, I do not find that there is any direct evidence that Banks was fired in retaliation for his Complaint against Defendant. Banks must instead establish a *prima facie* case of retaliation. *Hilt-Dyson*, 282 F.3d at 465 (7th Cir. 2002).

Banks cannot establish that he performed his job in accordance with Defendant's legitimate expectations. *Id*. Regardless of the retaliation he believed he was experiencing, Banks was not entitled to leave a harassing and potentially threatening voicemail message for his manager. If Banks had been fired for innocuous behavior, he might be able to argue that Defendant was "biding its time to create a space between the date of the claim and the date of the discharge, and in the interval gathering pretextual evidence of misconduct to provide a figleaf for its retaliatory action." *Pryor v. Seyfarth, Shaw Fairweather &Geraldson*, 212 F.3d 976, 980 (7th Cir. 2000). Banks' irate message was no figleaf; rather, it provided an entirely legitimate reason for Defendant to terminate his employment.

Despite his frustration with his treatment at the hands of various managers, Banks' was not entitled to lash out in the manner in which he did, without facing the risk that he would be fired for insubordination. Moreover, Banks cannot point to similarly situated employees who were treated more favorably than he despite engaging in the same conduct. At best, Banks has evidence that another employee, Ken Dowd, "raised his voice" to Oskam and was not written up or fired for that conduct. Absent any further description of Dowd's behavior, there is

insufficient evidence that his actions were in any way comparable to Banks' voicemail.[13]  I am willing to concede the possibility that Banks' managers essentially goaded him until he lashed out in a manner that created an entirely legitimate ground to fire him.  Even if this was true, they did so without breaking the law, and their actions do not entitle Banks to relief.

To avoid summary judgment, Banks attempts to cast doubt upon Frank's testimony, contending that the testimony is self-serving and not worthy of belief.  Banks also makes an outright accusation that "Frank has lied repeatedly."  Banks tries, but fails, to support these allegations with evidence.  Frank testified that he forwarded Banks' voicemail message to Human Resources employee Brandi Beard within two days of receiving the message.  Frank testified that he intended to fire Banks but wanted Beard to review the message before he did, knowing that Banks had filed a lawsuit against the company.  Beard testified that she was not "consulted" on whether Banks "should be terminated" and that she could not recall having any conversation with Frank about Banks' performance after July 2000.  Construing these facts in Banks' favor shows only that there was, at best, a discrepancy between witnesses' statements. The testimony does not show that Frank lied, nor establish an issue of material fact sufficient to withstand summary judgment.

Finally, I reject Banks' argument that the decision to terminate his employment was made by individuals senior to Frank. Banks offers no evidence to support his accusation that

---

[13]Banks testified that Associate Manager John Suyak left a voicemail for all of the managers in which Suyak criticized the work of the previous night's closing management team. Defendant does not dispute this allegation.  Banks believed Suyak's behavior was inappropriate and brought it to Oskam's attention. Oskam "took no action" to discipline Suyak.  Absent further evidence that Oskam – and more importantly, District Manager and decision-maker Frank – believed Suyak's behavior constituted insubordination, there are insufficient facts to find that Suyak's behavior was truly comparable to Banks' behavior.  *See Bush*, 990 F.2d at 931; *and Plair*, 105 F.3d at 349-50, n.3.

Regional Vice President Swartling made the decision to fire him in consultation with Defendant's counsel. For all of these reasons, I find that Banks' has failed to present direct evidence that he was fired in retaliation for filing a complaint of discrimination and failed to establish a *prima facie* case of retaliation. Defendant's motion for summary judgment of this claim is granted.

### C. Defendant's Counterclaims as Retaliation

After Banks filed the Complaint at issue in this litigation, Defendant filed a counterclaim alleging breach of fiduciary duty by Banks. Defendant claims that Banks misappropriated and used confidential company property in violation of company policy, and that Defendant became aware of this breach of duty during discovery triggered by Banks' lawsuit. Banks complains that this counterclaim is yet another instance of retaliation by Defendant against him.

In order to establish a *prima facie* case of retaliation, Banks must demonstrate that he suffered a materially adverse employment action. *Hilt-Dyson*, 282 F.3d at 465 (7th Cir. 2002). Defendant's counterclaim is not an adverse action that could constitute grounds for a claim of retaliation. *See Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998) ("it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation"); *and EEOC v. K&J Mgmt. Inc.*, 99 C 8116, 2000 U.S. Dist. LEXIS 8012, at *13 (N.D. Ill. June 7, 2000) ("filing a counterclaim is unlikely to chill plaintiffs' exercise of their rights to challenge discrimination" as "plaintiffs have already made their charges with the EEOC and initiated a lawsuit against their employer"). Defendant's counterclaim does not fall into that "rare" subset of claims that might constitute retaliation.

Banks claims that his case must be distinguished from those just cited because there is a risk that the counterclaim will chill his exercise of his rights by exhausting his resources. Yet

Banks does not explain how the expense of defending against the counterclaim is any different for him than for any other plaintiff facing a counterclaim filed by an employer. Moreover, despite Defendant's counterclaim, Banks has aggressively pursued his claims and his defense of the counterclaims. For lack of a materially adverse action, Banks' claim of retaliation on the basis of Defendant's counterclaim fails as a matter of law. Defendant's Motion for Summary Judgment on Banks' claim of retaliation based on Defendant's Counterclaim is granted.

### III. *Banks' Motion to Deem Facts Admitted*

Shortly after the parties submitted their briefs on Defendant's motion for summary judgment, Banks moved to have many of his facts deemed admitted and moved for leave to submit additional evidence that was inadvertently omitted from his filings opposing summary judgment. Banks seeks to have 95 of his more than 480 Local Rule 56.1 "additional statements of material fact" deemed admitted because of Defendant's response to those statements. Defendant disputed each of those 95 facts, arguing that the facts were not supported by the cited and provided record evidence because Banks either: a) failed to include in his appendix the evidence on which it was relying; or b) relied on evidence which simply did not support the facts in the manner Banks alleged. Banks asks me to deem his facts admitted because Defendant's disputes were improper, as it disputed Banks' facts without offering an alternative citation to the evidence that would support the purported "dispute." Defendant was under no such obligation to do so, particularly when it was Banks who violated the rule by failing to properly cite to record evidence in support of its alleged statements of fact. *L. R. 56.1(a)(1), (a)(3), (b)(1)* and *(b)(3)* (a party submitting a statement of facts must cite to and provide affidavits, parts of the record and other supporting materials relied upon to support each fact). Defendant's challenges to Banks' statements of material fact were entirely proper.

Defendant's first category of challenges involved facts for which Banks simply forgot to include the relevant evidence (*e.g.*, pages of deposition testimony). However, simultaneously with his motion to deem facts admitted, Banks filed a motion to amend his appendix in order to correct these errors. I grant Banks' motion for leave to amend his appendix to include inadvertently omitted pages of deposition testimony to which both parties had access. Banks' motion for leave to amend was filed shortly after the parties' summary judgment briefs, and allowed for a full and proper review of the facts on a lengthy and detailed motion for summary judgment. I relied on those facts when necessary in this opinion, but only to the extent that they were fully supported by the amended record.

Defendant's second category of challenges involved facts for which the evidence on which Banks relied simply did not support the facts in the manner Banks chose to characterize them. An example will demonstrate Plaintiff's tendency to color facts with opinion. Banks moves the Court to deem admitted his Additional Fact 468, which reads:

> Associate manager John Suyak left an angry voicemail for all the managers after a store opening in which he condescendingly criticized the previous night's closing management. (Banks Dep 275-77).

Defendant responded (in relevant part) stating:

> To the extent the Court deems the Paragraph material, however, it: (1) is disputed that Suyak left an "angry" voicemail, on the basis that such allegation is not supported by the cited and provided record evidence, and (2) the remainder of Paragraph 468 is undisputed.

Defendant's only, and legitimate, dispute was with the proposition that Suyak left an "angry" voicemail. None of the pages relied on by Banks state or suggest that Suyak's voicemail was "angry." Defendant properly disputed Banks' statement of fact in this instance, and for many of

the other facts that Banks now seeks to have admitted.  I did not rely on any facts offered by

Banks that were not properly supported in the record.[14]

Therefore, Banks' Motion for Leave to have Additional Facts Deemed Admitted is

denied in large part; *e.g.*, with respect to those facts for which the evidence on which Banks

relies simply does not support the facts as he chose to construe them.  The motion is granted with

respect to any facts that are now properly supported by evidence included in Banks' corrected

appendix.[15]

---

[14]Alternatively, some facts on which Banks relies are inferences from the supporting evidence, rather than direct statements extrapolated from the evidence.  For example, Banks' Additional Fact 115 reads: "CBOCS has reinstated general managers to the same position after they return from medical leave. (Beard Dep 24-25)." Defendant's response reads: "[d]isputed, on the basis that such allegation is not supported by the cited and provided record evidence."  In her deposition, Beard testified that it was not "Defendant's policy to return a general manager to their position after general leave."  She also testified that "if a GM left to be on FMLA, that person would not necessarily come back as a GM."  Plaintiff chose to construe that response as an affirmation that Defendant did return some general managers to their position after FMLA leave – an inference that is neither illogical nor unfair. In these instances, I construed the facts in Banks' favor when I found a legitimate factual dispute based on plausible or logical inferences.

[15]I will not rule individually on each of the 95 statements of fact Plaintiff seeks to have admitted. Those facts that were relevant to the resolution of Defendant's Motion for Summary Judgment are addressed appropriately within the opinion in light of my rulings on Banks' Motion to Deem Facts Admitted and Motion for Leave to Correct Appendix.

*Conclusion*

In sum, Defendant's Motion for Summary Judgment of Plaintiff's Claims is GRANTED;

Plaintiff's Motion for Leave to Correct Appendix is GRANTED; and Plaintiff's Motion for

Leave to Have Facts Deemed Admitted is DENIED IN PART and GRANTED IN PART.


ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: May 9, 2005